We will hear argument first this morning in Case 19-1231, Federal Communications Commission v. Prometheus Radio Project and the Consolidated Case. Mr. Stewart. Mr. Chief Justice, and may it please the Court, Section 202H of the Telecommunications Act of 1996 reflects Congress' conclusion that, in light of intervening competitive developments, broadcast cross-ownership restrictions adopted in an earlier era may no longer be warranted. To ensure that such restrictions do not remain enforced simply through inertia, Congress required the FCC to re-examine those rules every four years and to repeal or modify any rules that no longer serve the public interest. After reconsidering its ownership rules in accordance with Section 202H's mandate, the FCC determined in 2017 that its newspaper broadcast and radio television rules should be repealed entirely and that its local television rules should be relaxed. The Commission explained that the profusion of new media outlets, particularly through cable and the Internet, alleviated viewpoint diversity concerns that had originally justified the restrictions. It further found that the rules disturbed the public interest by preventing economically efficient combinations that would provide consumers better broadcast service. The Court of Appeals did not find fault with that analysis. Indeed, the Court in 2004 had sustained the FCC's determination that the blanket newspaper broadcast cross-ownership ban no longer served the public interest. The Court nevertheless vacated the FCC's rule changes on the ground that the agency had not adequately assessed the change's likely effect on minority and female ownership levels. The Court's elevation of that single factor has no basis in the governing statute, and the Court failed to show adequate respect for the agency's predictive judgments and its balancing of competing policy objectives. The Third Circuit's judgment should be reversed. Mr. Stewart, was the FCC required to consider the impact on minority and female ownership in the 2017 reconsideration order? We don't think anything in the statute required the FCC to consider that factor. The Court of Appeals in what we refer to as Prometheus 3, its prior decision in this line of cases, had included a footnote that directed the FCC, when it next re-evaluated its cross-ownership rules, to consider that factor. And the analysis that the FCC did in the reconsideration order was in compliance with the Court's mandate. So it could have said nothing about that at all in changing the focus of its regulations? Yes. Historically, when the Commission has adopted cross-ownership rules of various sorts, it has been to promote viewpoint diversity and localism, to ensure that there is as much of a plethora as possible of distinct voices within the local community. And it has not historically taken into account impacts on minority and female ownership in conducting that analysis. And nothing in 202H would have required the Commission to start doing that in its quadrennial reviews. What scrutiny would apply when the Commission simply shifts a priority? Let's say that there was a consideration of female and minority ownership and the cross-ownership rules, and it just decided, well, we think the latter is more important than the former, so we're going to focus solely on the latter. I think it's really a rational basis review. That is, if the FCC had decided to adopt an explicitly race or gender-conscious standard, that is, give a preference to members of racial minorities or to women as such, then it would be required to satisfy heightened scrutiny. Thank you, Counsel. Justice Thomas? Thank you, Mr. Chief Justice. Mr. Stewart, you indicate that the landscape in the area of viewpoint diversity has changed over the years. Could you talk a bit about that, particularly? I'm interested particularly in the effect mentioned in your briefs and some of the others as a result of some of the new Internet-based platforms. I think the idea is that when the rules were first adopted, in many local communities there might be three broadcast stations and one local newspaper and basically four independent voices within the community providing local news coverage and other forms of coverage. If two of those outlets were owned by the same entity, that would be a substantial diminution in potential viewpoint diversity. Now, when you have a plethora of Internet-based platforms, cable stations that can also provide local news coverage, the reduction in viewpoints within the broadcast sphere specifically is not going to be nearly so significant in light of the profusion of different viewpoints that will be available to the consumer. So do you have—is there any sort of structural program or requirement, such as we have here, that is specific to these alternative platforms? We really are not talking in this case about regulation of the Internet or regulation of cable. I think the justification for enhanced regulation of the broadcast media has always been that the broadcast spectrum is scarce. Not as many people can broadcast on the frequencies as would like to, and therefore it's necessary to have a federal agency that allocates the spectrum and decides how it can best be used to serve the public interest. And there isn't the same sort of need with respect to cable and the Internet, because one person's voice doesn't crowd out another's. Thank you. Justice Breyer? I'm thinking of it solely as the anti-merger part. In anti-merger law—merger law generally, I think, has a theory, and the theory is beyond a certain point and other things being equal—you have fewer companies in a market, the harder it is to enter, and it's particularly harder for smaller firms. And here, smaller firms are heavily correlated or more likely to be correlated with women and minorities. But the opposite view, which is what the FCC has now chosen, is they want to move or allow to be moved towards more concentration. So what's the theory that that wouldn't hurt the minorities in women or smaller businesses? What's the theory the opposite way, in other words? I'm not asking for data, I'm asking for a theory. Well, let me take the two points you made in order. The first is, with respect to possible advantages to small entities, the FCC has devised other programs like the incubator program and the eligible entity definition that are intended to give certain regulatory advantages to small entities. And those rules may incidentally benefit female and minority owners or prospective owners, even though they're not limited to those people. The second thing is, the theory behind what the FCC did was, in part, the data don't show it, but in part, with respect to some of these rules, the intuition really isn't there once you unpack things. For example, with respect to the newspaper broadcast cross-ownership rule, the rule that a single entity can't own both a newspaper and a broadcast station, the FCC found that if that rule was eliminated, the most likely consequence is that broadcast stations would buy newspapers rather than the reverse, because ... Mr. Salido? Mr. Stewart, you said earlier that the commission was not required by the statute to consider minority and female ownership, but the commission did that. And therefore, could we reverse the court of appeals on the ground that the commission simply wasn't required to consider this factor at all? And does it matter that the panel had previously indicated that the commission had to consider that factor? If you concluded that the statute actually barred the commission from considering that factor, you could reverse the court of appeals on that basis. I think if you simply concluded that the commission was either allowed to do it or not, as it shows, you might think that you need to analyze the commission's assessment of that factor at least a little bit in light of the fact that the commission analyzed it. But even the court of appeals didn't say that the commission ignored the weight of the data or that the data affirmatively demonstrated that female and minority ownership levels would be reduced. It simply said the commission hasn't amassed enough data to reach an informed conclusion one way or the other. And we think that was certainly error. On that point, the court clarified in Fox Television that the APA doesn't require, quote, obtaining the unobtainable when it comes to data supporting a decision, but that the agency might be required to analyze data that, quote, can be readily obtained. There's a big gap between those two poles. Where should we draw the line? I think here it's not a matter of the data could readily be obtained. That is, the deficiencies in the data don't result from the agency's current data collection practices. What the agency was trying to do was assess the potential consequences of relaxing the ownership rules by looking at arguably analogous regulatory changes that had occurred in 1996 and 1999 and asking what happened after that. And so the deficiencies in the data are really deficiencies in the data that predated those regulatory changes. Justice Sotomayor? Mr. Stewart, I'm a bit confused. It seems to me that the FCC for decades has been saying that minority and women ownership is in the consideration of it, is in the public interest. And I don't see anything in the ruling below that was subject to review by the circuit that said otherwise. It may have said that it didn't think the changes would affect that issue. It said other things, but I don't think the FCC has ever disavowed that that consideration of that factor should be given in its review. The agency has never, has frequently said that this is a factor that may be taken into account in its public interest analysis generally. All right, so let's stop there. That's exactly what it said. And I saw the circuit court saying, that's what you said, but your consideration was inadequate because you didn't explain it. And we have a legion of, adequately explain it. We have a legion of cases that say, you don't have to rule in favor of one point of view or another, but when you're rejecting something, you should give it adequate consideration. Isn't that what we're judging? I think there are two things I would say about that. The first is that although the agency has historically looked at enhanced female and minority ownership as a goal to be achieved through some means, it has not historically looked at that criterion as a basis for its cross-ownership restrictions. In adopting those restrictions, it's looked at other factors. The second thing is that the court of appeals chided the agency not for conducting an inadequate analysis of the data that were available, but for having inadequate data. And I think we've made a strong showing that there were no better data available with respect to the demographic composition of the ownership group pre-1996, pre-1999. Thank you, counsel. Justice Kagan. Mr. Stewart, if I could continue in that vein. As I understand it now, you're saying that female and minority ownership has not really been a factor in 202H determinations, but it's not the way I read your brief. And I think it's not the way I read past the actions by the FCC under 202H. So I'm wondering, what are you saying here? Are you saying that this is a new thing, that those things are not considered, or that they've never been considered under 202H, which is not what your brief says? What are you saying? What I was really talking about was the era well before Section 202H was enacted in 1996, the era back in 1975, for instance, when the Commission first adopted the newspaper broadcast cross-ownership ban, and the years since then when it had retained that ban and when it had adopted rules dealing with radio and television cross-ownership. In that era, the rules were justified by considerations of viewpoint diversity, but what the Commission meant was it's better to have more independent outlets in the community. I guess I'm still not really understanding you, Mr. Stewart. So I'll just ask, in your brief you say the agency has traditionally treated this form of broadcast diversity, meaning minority and female ownership, as an element in its multi-factor public interest analysis. Are you still sticking to that statement? It has often said that, and it has tried to devise ways that that objective may be achieved other than the cross-ownership rule. So, for instance, with the— Okay. If you look at this, in this rulemaking, were you saying, look, we don't think that the changes in these rules will affect female and minority ownership, or were you saying something more like, we don't have evidence of this and we're not going to let speculative arguments get in the way of what we want to do otherwise? We were saying the evidence is fragmentary, but based on the evidence we have, our best assessment is there will not be a substantial effect. And the mere possibility that there could be such an effect is not a sufficient basis for foregoing regulatory changes that we would otherwise deem to be very desirable. And then Justice Gorsuch? Good morning, Mr. Stewart. The parties dispute the propriety of the Third Circuit holding onto this case and all of its various iterations for the last, I don't know, 17 or so years. I'm curious what the government's position on that is. In succeeding stages of this litigation, there have been petitions for review filed in other circuits, and there have then been requests to transfer the cases to the Third Circuit. The government in the past has not opposed those requests. I think we're a little skeptical that the Third Circuit's repeated statements that it is retaining jurisdiction really have operative legal effect. That is, if the next time around a petition for review is filed in some other circuit that would otherwise be an appropriate venue, that circuit can decide for itself whether to transfer the case to the Third Circuit. But we don't think that that circuit would be under an obligation to do so simply because the Third Circuit has included this in its prior order. Thank you. Justice Kavanaugh? Thank you and good morning, Mr. Stewart. A follow-up on Justice Sotomayor and Justice Kagan, to make sure I'm clear. Under the statute and the public interest standard, does the FCC have to consider the effect of relaxing the rules on women and minority ownership? No, we don't believe so. The fact that it is a public interest consideration that could be sort of decisions doesn't mean that we have to consider it in making every single regulatory decision we make, including relaxation of the cross-ownership rules. Do you agree that the FCC did consider it here? It considered it, and if the FCC had concluded there was likely to be an adverse impact on female and minority ownership, it would then have had to decide how do we balance that against the identified benefits of the rule. The FCC never got to that point. Having considered it, doesn't the FCC have to justify how it considered it? I think the very most you could say that the FCC has to do is provide a reasonable, not necessarily a view that the court deems correct, but a reasonable view of the evidence that is before it. It doesn't have to amass additional evidence simply to be able to pronounce with a higher degree of confidence. Follow-up on Justice Breyer's question, what's the theory for why it wouldn't hurt women and minority ownership, the theory he asked? Can you continue your answer there? Yes, with respect to newspaper broadcast cash cross-ownership, for instance, the commission found that the most likely consequence of eliminating the ban is that broadcast stations will buy newspapers rather than the reverse, because the newspaper industry is in such trouble. If a broadcast station buys a newspaper, that doesn't affect any form of centralization or consolidation of ownership within the broadcast industry. The existing broadcast owners remain the same. It's just one of them has bought a newspaper, and that may allow it to achieve economies of scale and provide better service to the community. Thank you. Justice Barrett? Mr. Stewart, I want to go back to the questions that Justices Sotomayor and Kagan were asking you. I understood your brief to be saying that the FCC, or to be conceding that the FCC had long taken minority and women ownership into account, but then you pivoted a little bit and said that it took into account because the Third Circuit's opinion required it to. I wasn't entirely clear which position you had settled on, so could you clarify that for me? I think what I meant to say was it has long identified minority and female ownership, an increase in ownership levels or a decrease in the current underrepresentation as a good that would serve the public interest. It has not historically taken that particular public interest factor into account in determining whether particular cross-ownership restrictions specifically should be adopted or retained. For example, it attempts to achieve that goal through other means such as preferences through small businesses that are race and gender neutral but may incidentally help minority and female owners. Mr. Stewart, can I just interrupt and ask another question before my time elapses? Do you see a difference between a stated goal of enhancing minority and female ownership and not harming minority and female ownership? If so, which is the FCC's? I think it is both. I think the FCC would be cognizant of either argument, again, outside the cross-ownership context, either of arguments that an existing regulatory change is good because it will increase minority and female ownership levels or a proposed regulatory change is bad because it would decrease them. I think the FCC would be open to either form of argument. And again, what we're talking about is race and sex neutral measures, not race or sex preferences. Thank you, counsel. A minute to wrap up. Mr. Stewart? Thank you, Mr. Chief Justice. I think it's easy to lose sight of what extensive analysis the FCC did here because so much of that analysis is undisputed. The FCC concluded that because a variety of alternative media voices are now available to consumers, the viewpoint diversity concerns that originally prompted the cross-ownership rules were far less acute today. The FCC also explained that if the ownership restrictions were repealed or relaxed, owners could achieve economies of scale. For instance, a broadcast station, by buying a local on both platforms, and it could thereby provide better broadcast service to its consumers by using the resources of the newspaper. Thank you, Mr. Chief Justice. Thank you, counsel. Ms. Walker? Thank you, Mr. Chief Justice. May it please the court. In this case, the FCC decided that broadcasters should not have to operate under ownership restrictions dating back to the Roosevelt administration. I'd like to focus on the statutory reasons why that was lawful. 202H was meant to drive real reform with a focus on competition. Here, the Commission statutorily required findings that the rules are no longer in the public interest as a result of competition are unchallenged. Yet the Third Circuit vacated the order because the Commission failed to adequately consider minority and female ownership. The statute does not say one word about that issue, and the APA does not require the FCC to consider it either. The Third Circuit had no basis, other than its own policy preferences, to make that a mandatory, much less controlling factor in all 202H reviews. The FCC properly did the job Congress gave it. That is what matters, and the order can and should be upheld on that ground. I welcome the court's questions. Ms. Walker, are you saying that it would have been arbitrary and capricious for the Commission to consider the impact on minority and female ownership? No, but it was not required as you asked, Mr. Stewart, Mr. Chief Justice. In fact, under the Commission's analysis of the order, the outcome of the minority and female ownership discussion couldn't have changed the outcome because the FCC decided, for instance, that the newspaper broadcast cross-ownership rule was no longer in the public interest and had to be Well, given that the Commission had considered minority and female ownership for some time, wasn't it under some obligation, under State Farm, for example, to explain why it was not focusing or even weighing that interest in the 2017 order? No, Your Honor, because the Commission never relied on minority and female ownership as a basis for the structural ownership rules, which are the subject of 202H and what this entire case is about. The Commission has alluded to that as a policy, but never in the context of these rules. In fact, it has said the opposite, that these rules are an inappropriate vehicle because they don't really work to promote minority and female ownership. It said that in the 2014 review, in the 1985 order, and in the order on review here. To what extent, if any, is your position inconsistent with the Solicitor General's position? On the question of what the Commission has historically done, not inconsistent. We're just being more specific to say that policy has never been advanced with respect to the ownership limits, and I heard Mr. Stewart say this morning that he agrees with that. We would like the Court to resolve this case on statutory grounds and not merely decide that the Commission's consideration of the minority and female ownership issue was adequate. Justice Thomas? Thank you, Mr. Chief Justice. Ms. Walker, to follow up on your last answer, can you think of any example of an instance in which the FCC has used structural ownership rules such as this one to advance minority or female ownership? I do not believe, after my extensive work on this case, that there is a single example of that. And again, the Commission has said the exact opposite. It has said that structural ownership limits are not an appropriate means to promote minority and female ownership because there is no evidence or any demonstrable indicia that those rules actually promote those interests. The Commission has therefore chosen direct means, Justice Thomas, like tax certificates and distress sales. That's how the Commission has promoted those interests, and it just has never done that ever with respect to the structural ownership limit, and that is what this case is about. So what do you think, other than diversity of viewpoint, what other interests are being advanced by this rule? The traditional public interest rationales for these rules, Your Honor, are viewpoint diversity, localism, and competition. Those three rationales underlay the adoption of the rule, and the Commission has consistently relied on those. We think those are appropriate factors, but on our proffered reading of the public interest in this statute, we don't think the Commission or conductors can draw in brand new rationales as an excuse to keep outdated rules or, worse, to make more rules. That turns the statute completely upside down. So have these interests become somewhat less important with the rise of other platforms, particularly the Internet platforms? Yes, Your Honor, and I think your question draws out the fact that the broadcaster's competitors, all these new platforms, all these new social media formats, are completely unregulated, yet broadcasters labor under these rules that literally go back to the 1940s. That makes no sense and is extremely unfair as a competitive matter, which is why the Commission reasonably decided to free broadcasters of these archaic rules. Justice Breyer? Thank you. I'm going to oversimplify, but earlier commissions, before this particular last effort, I read it as saying, look, television, radio, newspaper, they're all in the business of providing news. They're all somewhat competitive, and we want to stop them from being concentrated, so we have our rules. And one thing about those rules, one thing only, is that they will not hurt small businesses. They will tend to help small businesses enter more easily, and small businesses tend to be correlated with women and minorities. No, we have a change, and the change seems to be we don't see any effect. Okay? Now, normally, when an agency changes its rules, it has to explain why. It's just a question of explaining it. Well, that's the same question I asked before. What's the theory? Where's the explanation? Well, with respect, Justice Breyer, the earlier commission never said it was keeping the rules for the purpose of promoting minority and female... No, I'm not saying for a purpose. I am doing it the opposite way. There is no negative effect on small businesses. In fact, it's positive, and looking at the public interest generally, there is no negative, and it's a positive for women and minorities. Then they change. Okay? Where's the explanation? Justice Breyer, I don't think the commission ever said what you are hypothesizing. They have never said, even in the 2016 order that predated the reconsideration order, that the rules would help. The structural ownership rules, it's important that we be specific, that that would help small minorities and women by correlation. They did say that with respect to the diversity order, that the Third Circuit ruled without any explanation throughout, but the 2016 order that predated the order on review actually never said that the ownership limit would advance the interest of even new entrants. Justice Alito? To paint a picture of what this case means in real-world terms, can you give me a concrete example of some beneficial development that would occur if the commission's rule is sustained, but that will be prevented if it is not sustained? For example, Justice Alito, a local broadcaster might buy a failing newspaper. That would be a very good thing. As the record shows, and many of our NICI explains, newspapers have been in a downward spiral for decades. A local broadcaster could buy that newspaper, help get it back up and running, and be providing more local news and more local content for the community. That would be an thing that would not be allowed to happen if the Third Circuit is not reversed. On that point, Justice Alito, if I might, it's important to note that respondents have not even challenged the commission's statutorily required competitive findings. Why? Because there really is no serious argument that these rules still are necessary. Is that a realistic possibility? Can you point to a real-world example of a local television station buying a failing newspaper and keeping it in business? I believe the amicus brief of the affiliates lays out in detail a lot of examples where television stations have been able to do that or buy another television station in the same market, pool resources, and create more local programming. So I refer you to those amicus briefs. But, Justice Alito, another real-world point is that, for instance, Amazon gets to own the Washington Post today. Nobody thinks that's the end of democracy. It's surely not the end of democracy if a local broadcaster can buy a local newspaper and keep it alive. Thank you. Justice Sotomayor? Counsel, the way you want us to rule requires us to go through the FCC's history with this issue, starting presumably in the 1970s and now going over close to 50 years, practically. You're encouraging us not to look at what might be a simple issue, which is, was the explanation given adequately? I don't know why either you or the Solicitor General need to go that far. Could you explain to me if there's a simpler reason why we should go to the more complex reason? Well, I actually think the statutory reason is not as complex, but I'll get to that next. The reason why we, the broadcasters, are asking for statutory relief is because it took us 17 years to get to this court. 17 years of litigation where the Third Circuit was correct. Well, part of that problem is not with what the Third Circuit did. It's what the government did. The government was acceding to the Third Circuit's jurisdiction up until this moment, meaning at every moment in which there had been a motion to transfer the case, the government agreed to it. I don't think you can blame the Third Circuit or the fact that it retained jurisdiction for what the government encouraged. Well, it was the Third Circuit's dilution of 2028 that's also the problem, but you're right, Justice Sotomayor. We've not been aligned with the government at all steps, and that's why we're here trying to protect the- So I've got another question. You have not told me or given me a line to draw as to when it's appropriate or inappropriate for a circuit to retain jurisdiction in a complex case. I don't think you need to draw a hard line, but here it's clear we're way outside of anything appropriate. One panel of the Third Circuit has retained jurisdiction for 15 years over four successive separate quadrennial review orders. That's excessive, I think, by any standard. Justice Kagan? Ms. Walker, I'd like you to assume with me that in applying its public interest standard generally, the FCC has always thought of one factor, not the only factor, obviously, but one factor is minority and female ownership. I'd further like you to assume, and I understand that you can test this as a factual matter, but I just want you to assume it with me now, that that historic practice has been true in the 2028 context as well as in rulemaking or license giving or anything else that the FCC does. If you assume those things, what obligation would the FCC have to say why it was not taking that consideration into account here? Well, we think that statute actually would preclude consideration of that factor here, even if the Commission wanted to. I draw your attention to our statutory theory, which is that the public interest here has to be cabined in some way, and so we read the statute as asking the Commission to go back to the original public interest rationales for whatever rules they are reviewing under 2028, and here everybody agrees that would not include minority and female ownership. I'm sorry, if I just make sure I understand. You're saying that even though the FCC can use minority and female ownership as a factor in doing rules generally and in giving licenses, when it comes to 202H review, they affirmatively cannot. Not if it was not an original basis for the rule, and why does that make sense, Justice Kagan? It keeps the Commission to the task of reviewing what it has done before, not coming up with new rules or new rationales to even add ownership restrictions. I think my time is up, so I'll quit there. Justice Gorsuch. Good morning. I wanted to return to the question Justice Sotomayor raised, and that is, what's at stake here between your rationale and the FCC's? I guess you ask us to rule on a statutory basis. The FCC asks us to rule on its reasoned decision-making basis. I would have thought perhaps a win's a win from your client's perspective, and I'd like to understand why that's not the case. Well, as a practical matter, Justice Gorsuch, if this Court doesn't clarify what the next quadrennial review, the 2018 quadrennial review that's on ice, pending the outcome of this Court's decision, if the Court merely holds that the Commission adequately explained a completely atextual factor that the Third Circuit imposed unilaterally on the Commission, we haven't made much practical progress, because that might even embolden the Court to add other atextual factors. Well, let me interrupt you there. I mean, if this quadrennial review is allowed to go forward, and the experiment is allowed to play out, and data is obtained, presumably you have confidence in the results, they'll show great public benefit, why wouldn't that be sufficient? I think the problem, Justice Gorsuch, is that respondents' theory of the statute would allow the Commission to add totally new theories as a reason for keeping rules, so we'll never have any regulatory reform, or worse, tightening the ownership restrictions. Congress definitely did not think that 202H was supposed to be a vehicle for tightening. On that, I mean, you play by the sword, you die by the sword, and if you adopt and permit a statute as broad as public interest, you can't be surprised when it winds up including nothing, or everything, or something in between. But this statute doesn't just say the public interest. It says the public interest as a result of competition, and we've offered a reading that ties that, anchors it, in the purpose of the statute, which is regulatory reform. This is not a freestanding reference to the public interest like there is in other parts of the Communications Act and elsewhere in the federal law. It says, as the result of competition, and those words have to mean something. Justice Kavanaugh? Thank you, Chief Justice, and good morning, Ms. Walker. What do you do with the next sentence of the statute, which does refer to public interest in isolation? That sentence textually links back to the first sentence. The first sentence tells the Commission that it shall determine whether any of the rules are necessary in the public interest as a result of competition. The second sentence tells the Commission what to do if it makes that determination, that certain rules are no longer necessary. If it makes that determination, it has to repeal or modify them. So the determination referenced in the second sentence is the same determination referenced in the first sentence, so they textually link to each other, and it would have been peasantry for Congress to have to repeat, as a result of competition, after the words, the public interest, in the second sentence of the statute. Do you agree that if the term is public interest in isolation, that an agency has discretion to interpret that to encompass effects on women and minority ownership? I think it could, but it never did that here, and so the Third Circuit was wrong to say that that was a requirement under State's arm, and if it is a freestanding public interest standard, Justice Kavanaugh, I think that raises a non-delegation problem. We've offered a reading that ties the public interest to the task and the unique context of this particular statute, and NBC says we have to pay attention to statutory context here, and the text, the context, and the purpose of this entire statute all point in the direction that Congress meant this to be a vehicle for deregulation, not more regulation. Thank you, Ms. Walker. Justice Barrett. So, Ms. Walker, given that Congress wanted the statute to be a vehicle for deregulation, not more regulation, is it your position that the word modify in 202H, when it requires the commission to modify or repeal as part of its quadrennial review, that a modification can never be an additional regulatory requirement? Yes, we agree with that reading of modify. Is it your—oh, go ahead, Ms. Walker. You finished? I am finished. We agree. Okay. Then let's talk about the public interest and how it might affect a repeal or modification of a rule. Let's imagine that the commission finds that a rule no longer promotes competition, but believes the rule promotes viewpoint diversity and localism. In that event, is it your position that 202H requires the FCC to repeal or modify the rule? No, the commission gets to balance the traditional public interest factors on our reading of what the public interest means. Those are all three factors that underlie these rules, viewpoint diversity, competition, and localism. The commission gets to balance those, but it can't make up brand new reasons. And I just want to reemphasize, Justice Barrett, that in this order, if you read it carefully, you'll see that the commission had already made the public interest determination required by the first sentence by the time it got to the discussion of minority and female ownership. At that point, the commission had no choice but to repeal or modify the rules because the second sentence makes that mandatory. Thank you, Ms. Walker. A minute to wrap up, Ms. Walker. Thank you, Mr. Chief Justice. Section 202H was enacted 25 years ago. Since then, ownership rules have barely changed. That is not what Congress had in mind. And it took us, as I mentioned, 17 years of litigation to get to this Court. Now that we are here, we respectfully ask the Court to provide guidance on what the statute does and does not require. Absent that guidance, we're going to be stuck, most likely, in the same morass in the very next review, and Congress's intent could be thwarted for another 25 years. We thus respectfully ask that you clear the way for the statute to finally operate as intended, as a mechanism for meaningful reform with a focus on competition that does not allow atextual factors to trump the commission's expressly required competitive findings, which, again, are here completely unchallenged. For these reasons, we ask the Court to reverse the judgment of the Court of Appeals and instruct it to deny the petitions for review. Thank you. Thank you, counsel. Ms. Deutsch? Thank you, Mr. Chief Justice, and may it please the Court. This is an APA case about whether the agency engaged in reasoned decision-making. The government agrees that promoting broadcast ownership by women and people of color has long been the commission's own public interest goal, one that is fully consistent with the statute and is not a command imposed by the Third Circuit. The government also agrees that the agency must reasonably weigh all competing aspects of the public interest that it has identified in its quadrennial reviews. The problem here is that the reconsideration order fails this basic requirement of administrative accountability. Based on zero information about female ownership and a nonsensical analysis of badly flawed data on minority ownership, the agency repeatedly assured the public that consolidation would do no harm to either. The government now asks for deference. It says that the uncertainty was acknowledged, prediction is hard, and it argues essentially that because no harm was shown, there was nothing to be weighed. But because the no-harm findings here were wholly arbitrary, to defer on this record would only encourage agencies to do sloppy work to avoid making tough choices. Ultimately, if the commission wants to give less weight to ownership diversity or even abandon the goal entirely, nothing in the Third Circuit's ruling stands in its way. But what the commission cannot do under time-honored principles of administrative law is mask important policy changes behind such unreasoned analysis. Thank you, and I welcome your questions. Council, let's say the commission, there are sort of two different priorities, you know, priority A and priority B, and the commission is going along focusing on priority B, and then, I mean, there's a change in the commission membership or whatever, and the commission is now going to focus on A. Nothing to do with the record or findings or inadequacies on issue B. We just think that issue A is more important. How is that subject to APA review? At the minimum, there needs to be, as this court said in Fox, an acknowledgement that there has been a change in policy and then an explanation of why. Here, of course, there was no stated change in the policy goal of promoting minority female ownership, and there were repeated assurances that the deregulatory measures going forward would not harm that goal. Is it enough for the agency to say, well, you may have noticed, we're no longer talking about B, we're talking about A, and the reason is we think A is more important than B. Is that enough? I don't believe that's enough, Your Honor. I think they would have to say why it was more important. Well, how do you do that? I mean, if they're, you know, apples and oranges, but, you know, life is short, they only have so much time, and they think cross-ownership is more important than minority and female ownership. Those are two different things. Well, one thing they could have done here, for example, is to say, no matter what the harm to this other long-standing policy goal, which we have said on many occasions that our broadcast ownership rules are to promote, and I would point you to JA-335 and also the 2002 order cited on 32 of the NABRs, they could say, no matter the harm to this goal, it's really hard to measure, it's too uncertain, and we're willing to go forward for these other public interest goals because they are more important. But they did not say that here. Well, if their action focuses on a different set of priorities, in other words, you seem to be priority, they have to justify a determination that, A, is more important than B, when reasonable people can disagree on that. They can't just say, you know, yes, this is, female and minority ownership is a very important thing, but so is cross-ownership, and we could only, you know, as I said, we don't have resources to devote to both, and we're going to focus on cross-ownership. I think they would also have to say that we're willing to do that no matter the harm to something that we have repeatedly said is one of the goals of these rules. What is the basis for the Third Circuit's ruling? If you're going to shift, you have to say that it maximizes the benefit to the They said that you had to weigh the effects unless the commission ample space to weigh those effects and come out in favor of deregulation and balance as they saw fit. Justice Thomas? Thank you, Mr. Chief Justice. Counsel, I'm just a bit confused. Petitioners indicate that in the past, these structural ownership rules simply did not include minority and female ownership considerations. Could you address that and include in that at what point did those considerations, I'm not talking about the standalone rules such as, you know, tax preferences, et cetera, but just these structural rules, they seem to indicate that these rules are different from those standalone rules on minority and female preferences for diversity. Sure, Justice Thomas. I'm happy to point you to several places, starting in 1995 in a local TV rule that was predated Section 202H. The commission recognized that the potential for increased prices from the relaxing ownership limits and the concerns of considering the ability of minorities and women and committed to studying the effects of that. Then the 2002 order, where I would go next, that's on the NAB brief at page 32, the commission stated how it, quote, had historically used the ownership rules to foster ownership by diverse groups, such as minorities, women, and small businesses. In JA 335, the commission, again, says that it has a long history of promoting rules and regulations intending to promote diversity of ownership among broadcast licensees, including minority and female ownership, owned businesses, and as explained above, the commission's broadcast ownership rules help further this purpose. So while they're not targeted measures, they create the underlying structural, and I have many other examples, but those are the highlights. What's the difference between what you just said and the idea or the notion that the object of this rule is to promote program diversity of viewpoint and these other benefits are collateral benefits? And as I hear the argument, the petitioners suggest that you don't sacrifice or you don't veer away from the central purpose of viewpoint diversity and offer these collateral benefits, though they may be worthy. What's your response to that? Well, the commission has talked about fostering diversity by historically underrepresented groups, both as a freestanding interest in terms of having fair and equitable allocation of the scarce broadcast spectrum and one that is intertwined and supports the other public interest goals, not only viewpoint diversity, and there's record evidence on that at JA-335 again, JA-397, but also a benefit to other public goals like localism, and the NAB brief of 23 states puts that evidence there. Can you promote, I'm sorry to interrupt you, but what if focusing on the collateral benefits impedes disposing of the primary goal object, which is, again, as the petitioners argue, viewpoint diversity? If the commission reached that conclusion after a reasonable way, that would be fine, but that simply didn't happen here. There is no weighing whatsoever. Justice Breyer? All right. You read the briefs on the other side. There's an amicus brief that explains, economically speaking, why they want to get rid of the rules. It's a combination of failing company argument, economies of scale, so they have that before them, the FCC. Now, they didn't say they're abandoning the minority women policy. They didn't say that, or the small business policy. What they said is there's no evidence in this record to convince us if we do what these kinds of briefs say, that it will hurt our efforts there, and besides, we have two new things called incubator, and we have something called eligibility, and we're trying to preserve and encourage minority and women ownership that way. Okay? What's wrong with that? And you heard me ask the other side, aren't they changing their policy? And the other side says, no, no, there's nothing that's said in the past that the policy is different than that. So, I mean, the main thing wrong with that is that the assertions that are strewn throughout the reconsideration order that the deregulatory moves will not harm minority and female ownership. That isn't what they said. They said there's no evidence. They have a couple of sentences there which you've read. Yes, but they also- Why in heaven's name did you not, or groups that support you, given the tremendous number of people who I'm happy are interested in this, why aren't there some studies or something? There are 10,000 law professors and economics professors who look for studies to do. Why isn't there something? Well, there is something on this issue which they ignored even as they cited one- Okay, what? The free press study. Why did they ignore it? Okay, that's it. Is there anything other than that? Yes, they have their own study that's titled Whose Spectrum Is It Anyway that was cited in comments in the 2014 further notice of- Okay, I'll look at this. Yeah, and I would just say that there's a lot of wiggle room in the reconsideration order especially, but I would point you to the statement that the repeal of the NBCO rule will have no the TV rule repeal is not likely to harm minority and female ownership. We'll have no negative impact. That's one 20-way day. And again, these statements abound and they are framed as findings and determinations. And when you look at what they're actually based on, it's that listing of numbers on page 37 of our brief that has nothing on women. And as for the minority data, the American Statistical Association is here telling you that it is worse than no analysis at all to draw the conclusions that they drew. Thank you. Justice Alito? In your briefing, you argue that the petitioners forfeited any constitutional argument that the FCC could not consider minority or female ownership. Would you therefore agree that there is no need for the court to consider that constitutional question? Absolutely. And I would also point to this court's decision in the first box case, where it recognized that until the administrative law analysis of whether the underlying decision to be made is a reasoned one and you've addressed any arbitrary and capricious concerns, then it's premature to reach the constitutional question. All right. Thank you. Justice Sotomayor? Counsel, you're relying on the free press data. Could you give me your best authority for the idea that the FCC was required to utilize the free press data? I would point you to the administrative... And let me just follow up. And is there any requirement for it to have needed to explain why it didn't rely on it? I don't have a case at hand, Justice Sotomayor, other than the bedrock cases like State Farm. But, you know, having cited one of the free press data points in its listing of numbers, and then having ignored the results from that study that at least attempted to do a more reasoned analysis of the exact same question that the FCC purported to analyze in that listing, it's a little bit like throwing stones from glass houses for the agency now to be here saying that the free press study had its own problems. And so, you know, I think it's just bedrock have law that they need to, at the very least, explain why their analysis was better than the free press study, which they patently could not do. Finally, I don't think you're disputing that the agency gets to decide how important it thinks minority and female ownership is in the context of any given rulemaking. And I don't think the agency has changed its position that its ownership rules are not primarily intended to promote minority and female ownership. So how do we reconcile that with your position? I think it's, again, this is standard arbitrary and capricious review, which we told the court at the petition stage. The agency gets to set the goals consistent with the statute, and a reviewing court can only look and see whether they did what they said they were going to do and offered a reasoning explanation. The government here admits that if harm had been found, they would have had to weigh that harm. It would have, you know, to the extent to see whether it cautioned against the consolidation it wanted to go forward with. And, you know, we disagree that there was no harm to be found on this record. They didn't, especially for women. Thank you, counsel. I think you've gone over my time. Thank you. Justice Kagan? Ms. Deutch, you began your argument today by saying that the government agrees with you that minority and female ownership should be taken into account in decision making like this. But as I understand what the government has done this morning is to say that they don't agree with you. I mean, this is unlike in their briefs, but in argument, the government has said, well, with respect to 202H determinations, we've never taken into account female and minority ownership. And Justice Thomas asked you a similar question, but I just wanted to make sure that you had the opportunity to respond to that assertion of the government's that it had historically not taken female and minority ownership into account in the 202H context specifically. I didn't. It's a better question for Mr. Stewart. I agree that it hasn't been the only factor or a to the extent that Mr. Stewart was saying that it had never been considered as a factor. I think that's just not consistent with history. And then I'm really giving you an opportunity to tell me what to look to, to decide whether you or Mr. Stewart is right on that question. Thank you. So again, I would look to the earlier orders cited at page 6 and 10 on our briefs that are pre-date 202H. And then the first 202 review, 2002 review under 202H defines the policy goals and said, we will first define our goals so we can then assess whether our current broadcast ownership rules are necessary to achieve these goals. Then talks about the five types of diversity, which include minority and female ownership as one goal and says, and this is at 18 FCCR at 13634, encouraging minority and female ownership historically has been an important commission objective. And we affirm that goal here. And then again, JA 335 talks about how the commission's broadcast ownership rules help further this purpose of promoting minority and female ownership. So I suppose that that's right. And that the commission has historically considered this as, as, as one factor in its broader public interest analysis. But here the commission says something along the lines of, look, it's actually not a lot of data about how this rule will affect minority and female ownership to the extent that we have data. We think it's, it shows that it won't have an impact and and so we're going to go with this new rule. Why isn't that enough? Because it would be an important break with past commitments. Not only the repeated promise to collect data and analyze this problem, which as I said, goes back to the 1995 TV rule. Are you saying that the commission has a freestanding obligation to go out and collect data itself with respect to this? The commission can't rely on the notice and comment process to provide it with data? The commission has its own data already that it collects in the form 323. So no, I'm not saying that, but I think what was wrong with your first formulation or how it might've been, you know, more passable was if the commission had said, we can't figure it out. It's too uncertain. Put to the one side our promises about figuring it out better, but we're willing to move forward no matter the harm to this goal, even though we still think this goal is important, but we just, you know, we're throwing up our hands. We can't do it. Thank you. Justice Gorsuch, I'd like to pick up there. As I understand it, you'd be okay for the commission to say, we're going to try this no matter the harm to other goals. Um, why isn't what they did better than that? And what are we supposed to do about it? Um, the 1970, we have 1970s rules governing cross ownership still today. And the one thing we know about the 96 act is it, it had a deregulatory impulse and yet that impulse has never been exercised. The idea I think was to have experiments every four years and see how it goes. Um, and the agency saw all the data it can get. And, uh, as Judge Sirica pointed out, make, you know, one can, one can parse it and complain and fly spec it, but isn't the best source of data and experiment, uh, and isn't the agency in something of a catch 22 position, Judge Sirica wonders, but what do you, what do you say to those thoughts? Um, I have a bunch of responses. Um, first it's hardly fly specking evidence to assert that there will not be no harm, for example, to female ownership when you have zero. Well, but as you know, on that, they say that there just isn't, there isn't good data available. And, and in response to a prior, uh, third circuit order, they, they publicly solicited all the data anybody in the country could provide. Well, there were of that, but, but going to the larger point of the commission, uh, being stuck, you know, the FCC has much to do with the delays here. I mean, Prometheus three, for example, was third circuit simply telling the agency to hurry up. And we're here in 2020 looking at an cycle that began in 2010. That doesn't address my fundamental question that we were stuck with rules from the 1970s that 20 years ago, 25 years ago, Congress said were outdated. And when, when is the FCC going to be able to try and experiment? And if it says, and it's best considered judgment after multiple rounds of remands and multiple rounds of data collection and public comment, but it earnestly believes that these rules are going to negatively impact anyone and might actually affirmatively benefit most people. When exactly is it allowed to see and experiment with that for four years and then collect the data and see what actually happened? Well, a few things first, the, the agency tomorrow could issue a separate rulemaking on the, the NBCO rule, for example, out part from the 202H process and nothing impedes that. Second, there's no experiment now and see what happens. I think reasonable reading of 202H, which requires the agency to assess as competition has changed, whether the rules are necessary in the public interest at that moment. It isn't a license to move forward, no matter the harm to one of your own public interest goals. And then, you know, sort it out later, particularly because as we argue in our brief, the sorts of harms here from unwarranted consolidation cannot easily be undone. Let me ask you a question about the retention of jurisdiction here. I understand that courts obviously have the practice of sometimes deferring to another court and consolidating matters voluntarily, but what authority is there for the third circuit to have retained jurisdiction over not one rulemaking, but now three over the course of 15 years? That does seem a little unusual in its duration and in the number of rulemakings involved. I think Judge Williams called it contrary to the goals of Congress. Well, Justice Gorsuch, our view is that it's a proper exercise of that court's jurisdiction and the government never challenged it below. It happens sometimes, although not frequently, for similar cases that have long and complicated histories and also a history of agency delay. And, you know, of course the court can modify that ruling to the extent that it sees fit, but it doesn't undermine the core problem here, which is the arbitrariness of the reconsideration order. And on that basis, certainly the third circuit should be affirmed. Justice Kavanaugh? Thank you, Chief Justice, and good morning, Ms. Deutsch. You've referred, I think quite rightly, to administrative law basics a few times in your answers, and I want to get your reaction to one way to look at this. Courts obviously review agency legal interpretations to make sure the agency's not departing from the law enacted by Congress, and on that front, reviewing the law, our review is usually pretty tight, pretty stringent, putting aside whether there's ambiguity in the law. On the other hand, and critically, federal courts do not make the policy calls. We defer to agency policy judgments within the constraints imposed by Congress, and here it's the broadest possible language that Congress uses, public interest, not much of a constraint at all, a broad, and Ms. Walker alluded to, arguably too broad a delegation, but that doesn't give us much to work with, and then arbitrary and capricious review, and Judge Sciarica said this many times, is highly deferential to the agency's policy judgments, and there's a lot of case laws, you know, in the FCC context, Justice White's opinion for the court in the WNCN case, that predictive judgments made by the agency get especially a significant judicial deference, and so at the end here, it's deferential in the policy, the public interest standard, they made a predictive judgment. How can we, sitting here, second guess all that? Well, a few things, Your Honor. I agree completely that the agency's reasoned predictive judgments are afforded deference, and that's, you know, APA 101, but here there's no reasoned judgment to defer to, there is nothing there on women, no data and no explanation even or attempt to explain why the no harm finding that's arbitrary on its own terms that they drew for minority ownership would also transfer automatically to women. In cases like WNCN, NCCB, FOX, in every one of those cases, there is at the very least a reasoned decision tree set out by the agency of why they're doing what they're doing and how they're weighing the pros and cons. The government agrees to weigh, and they say, well, we don't have to weigh because we don't have any evidence of harm, but ignoring evidence of harm doesn't make it go away. And what do you say, and you might have indicated this to Justice Breyer, but what do you say is the scaling back these rules will negatively affect women in minority ownership? Well, certainly the free press study, which is cited in our brief and cited by the government in its analysis, and I would also point you to one of the early reviews where the commission itself recognized the drop in minority and female ownership after the consolidation in the late 90s, and that's cited in our brief at 10, at 15, FCCR at 11, 084. And also, the free press study, in addition to doing the historical trend analysis for minority, also did cross-sectional analysis for both people of color and women on stations and showed that the more consolidated the market, the less likely there was to be representation by these groups. Last question, to what extent, if any, should we take into account that during the pendency of this litigation, the local news industry has been decimated? Well, I think, I'm not sure that's in the record, but I think to the extent you want to take account of what's happening after this record has closed, there's a much easier path forward, which is to affirm the Third Circuit and let the already delayed 2018 review move forward, including analyzing the results of the incentive auction, which is another area where the data indicated that women and people of color were disproportionately entering the market. Justice Barrett? Ms. Deutsch, I have a question about the free press study. So, wasn't the, and maybe I'm, maybe I'm not fully understanding its scope, but I thought the free press study was largely backward-looking. So, for example, on page 39 of your brief, you talk about how its tracing concluded that the 1990s television rule changes contributed to the loss of 40 percent of the previously minority-owned stations. Was it entirely backward-looking, looking at the effects of rule changes in the past, or did it have a predictive component? The trend analysis was backward-looking, just like the government's analysis of the numbers was, just did it better by using better numbers that were corrected for the problems in tracing. But as I said, they also did cross-sectional analysis, so taking a snapshot in time, showing that the more consolidated the market, the less likely there were to be women and people of color or owners. And so, to be sure that I understand that, you're saying that they did make a predictive judgment? It offered predictive analysis, like if you make this change, then this is the likelihood that this will happen, this being the decrease in minority and women-based ownership? I don't think it went so far as that, but it was an inference that could be drawn from that analysis. Well, if it's just an inference that could be drawn from that analysis, why isn't the commission correct that there was no evidence in the record that showed there would be harm? Because its own numbers, even without any corrections, showed that there was harm from past consolidation, and there's no reason to think that that wouldn't happen from future. Plus, as I said, there's this other study called Whose Spectrum Is It Anyway? It's cited in the notice of proposed rulemaking in 2014, and in some of the comments that interviewed about 100 market participants that chronicled the difficulties faced by more diverse owners under consolidation. You were talking, you talked in your brief about the need for statistical evidence and the fact that the government had no evidence at all in the record about the effect on women ownership, as opposed to the minority evidence, which you say that it ignored. But if there's no statistical evidence, and I hear you saying you're talking about the backward-looking free press study you're talking about, interviews, is there anything in the record that's actually a statistical analysis that shows the likely impact of these changes on the relevant minority and women community? Other than the sources I've mentioned, no. Thank you, Counselor. I don't have any other questions. A minute to wrap up, Ms. Deutch. Thank you, Your Honor. I have three points. I'll try to go fast. Minority and female ownership, I just want to reiterate, has long been baked into the public interest standard in this context. I've read you some of the quotes. Industry petitioners are up against the government, former commissioners, and history in contending otherwise. Second, the government agrees that a reasonable weighing of all public interest goals that they have defined in this context is necessary, and that simply didn't happen here. On this record, there's no reasoned predictive judgment to defer to on gender or on minority ownership trends, and the agency didn't make much less attempt to explain its decision to deregulate no matter the harm to its own public interest goal. And just the opposite, there are unfounded statements that permeate the reconsideration order about how the rule repeals will have no material effect or will not likely harm minority and female ownership. And although they talk a lot about the newspaper broadcast cross-ownership rule for the local TV changes, for example, that is the only evidence that they rely on for no harm is this listing of numbers on page 37 of our brief. Finally, I would note that the remedial concerns don't undercut the Third Circuit's core conclusion here, that the commission undertook dramatic regulatory repeal without reasonably considering an aspect of the public interest. I think it continues to espouse the colloquy with Mr. Stewart notwithstanding. The court can tweak the remedy as it sees fit, but the best course is to allow the commission to consider these questions afresh in its 2018 review, where it can analyze the better data, including the full results of the incentive auction, to reach a reasoned decision on whether deregulation is actually in the public interest. For these reasons and others in our brief, the Third Circuit should be affirmed. Thank you, counsel. Rebuttal, Mr. Stewart? Thank you, Mr. Chief Justice. Let me first clarify our position with respect to the potential impact of minority and female ownership data on the cross-ownership rules. My primary point is when those rules were first adopted, they were adopted for reasons other than their potential effects on minority and female ownership. And so the commission in deciding whether to retain those rules has naturally focused on whether the original justification continued to apply. Now, in the era post-1996, the enactment of Section 202H, you can find documents that list basically the full range of public interest considerations as potentially relevant to the 202H reviews. But I'm not aware of any instance, even under Section 202H, in which the FCC has actually amended, repealed, or retained a cross-ownership rule for the stated reason of its impact on minority and female ownership. It just historically, either before or after 1996, has not been a factor that has animated the commission's decision with respect to the ownership rule. Second, I think the most straightforward path to decide the case is to follow the one that the commission itself laid out in the reconsideration order. It said the historical reasons for the cross-ownership rules no longer apply. Allowing cross-ownership will likely benefit consumers. Acknowledge that incomplete data left uncertainty as to the likely effects of repeal and amendment on women and minorities. But the agency's best estimate was that there would be no harm, and the bare possibility of harm was not a sufficient ground for foregoing changes that the agency otherwise considered highly beneficial. The court has said numerous times that it will, quote, uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. And I believe the agency's path can reasonably be discerned here. And third, I'd like to focus again on the quadrennial review scheme that Section 202 lays out. People have referred to the deregulatory thrust of the 1996 Act, and that's correct, but the principal purpose of Section 202H was to ensure that cross-ownership rules didn't remain on the books through inertia. That if they remained in place, it was because the Commission had reexamined them and had made a fresh determination that they continued to serve the public interest. And the Third Circuit's approach really thwarts that. If the cross-ownership amendments had been allowed to go into effect in the earlier year, we will now have more data on the potential effects of those rule changes on minority and women. The effect of the Court of Appeals decision is that the periodic review process can be derailed by commenters who identify possible countervailing effects and insist that the agency perform new research before it can amend the rules that are already in place. That has the very effect that Congress attempted to forestall in requiring quadrennial reviews. Thank you, Counsel. The case is submitted.